860 So.2d 610 (2003)
JCM CONSTRUCTION COMPANY, INC.
v.
ORLEANS PARISH SCHOOL BOARD.
Orleans Parish School Board
v.
Michael J. Gegg d/b/a JCM Construction Co., Integon Indemnity Corporation, Aetna Casualty & Surety Company, Guy Michael Leppich, in His Capacity as The Natural Tutor of Daniel Leppich, His Minor Son, Barbara Phillips, et al.
Integon Indemnity Corporation
v.
Orleans Parish School Board and Michael J. Gegg.
Nos. 2002-CA-0824, 2003-C-0299, 2001-C-1930, 2003-CA-1077, 2002-CA-0825, 2002-CA-0826.
Court of Appeal of Louisiana, Fourth Circuit.
November 17, 2003.
Rehearing Denied December 9, 2003.
*613 J. Warren Gardner, Jr., Janet L. White, Christovich & Kearney, L.L.P., New Orleans, LA, for Michael J. Gegg, d/b/a JCM Construction Company.
George F. Riess, Robert M. Rosenberg, Larry C. Becnel, Polack, Rosenberg & Endom, L.L.P., New Orleans, LA, for Orleans Parish School Board.
(Court composed of Chief Judge JOAN BERNARD ARMSTRONG, Judge CHARLES R. JONES and Judge DAVID S. GORBATY).
*614 JOAN BERNARD ARMSTRONG, Chief Judge.

PROCEDURAL HISTORY
In 1989, the Orleans Parish School Board advertised for bid proposals, pursuant to the Louisiana Public Contracts Law, LSA-R.S. 38:2181 et seq., for the relocation of two portable classroom buildings from Karr Junior High School to Harte Elementary School. Michael J. Gegg, d/b/a JCM Construction Company, Inc. (JCM) was the successful bidder on the project. JCM was advised by letter dated November 3, 1989, that he was to contact the School Board's attorney, Mr. Rosenberg, to execute the contract documents.
Article 20 of the "General Conditions" attached to the contract sets forth the contractor's obligation to provide insurance coverage. It states that the contractor "shall effect and maintain, until the date of filing of the Owner's acceptance of the work" six different types of insurance, including "Builders' Risk Insurance for Fire, Extended Coverage, Vandalism, and Malicious Mischief." Article 21, entitled "Submission of Insurance Policies," states that the contractor must furnish to the School Board's notary and the School Board's insurance consultant, at least five days prior to the signing of the contract, the required certificates of insurance. The article further provides:
The Contractor will not be permitted to sign the contract before the School Board Notary until the Certificates of Insurance or insurance policies have been approved by the School Board insurance consultant. In the event the successful contractor fails to provide the Certificates of Insurance or insurance policy for review, the amount of guaranty deposited by him will be forfeited to the Orleans Parish School Board, not as a penalty but as acknowledged liquidated damage.
On November 3, 1989, Gegg submitted to the Laurance Eustis Insurance Agency, Inc., the School Board's insurance consultant, a certificate of insurance showing various types of coverage (general liability, automobile liability, etc.) but not including builder's risk coverage. The certificate of insurance was initially returned by Joseph A. O'Connor, Jr., Vice-President of Laurance Eustis, with a written notation that the School Board should be listed as the certificate holder rather than Laurance Eustis. Gegg submitted a new certificate of insurance correcting this error, and on November 16, 1989, Mr. O'Connor sent Gegg a letter stating: "We have reviewed the Certificate of Insurance for the above captioned [Karr relocation project] and find it meets the necessary requirements for School Board purposes." The contract was executed on November 17, 1989, and recorded on December 1, 1989.
Gegg began work on the project in February of 1990. On August 9, 1990, after the project was substantially complete, but before the School Board had filed its formal acceptance of the work, three juveniles broke into the classrooms and started a fire, which completely destroyed the two portable buildings. The School Board refused to pay Gegg the remainder of the money due under the contract. On June 4, 1991, Gegg filed suit against the School Board seeking the balance due him as well as damages for the Board's alleged breach of contract. On July 14, 1991, the School Board filed suit against Gegg, the three arsonists, Gegg's insurer, and Gegg's surety, Integon Indemnity Corporation (Integon), seeking the value of the portable classrooms. The two suits were consolidated.
On June 14, 1994, the School Board moved for partial summary judgment against Gegg and Integon, alleging that *615 they were solidarily liable for all damages sustained by the Board as a result of Gegg's failure to procure builder's risk insurance as required by the contract. Integon also filed a motion for summary judgment. The motions were heard on September 30, 1994.
On October 5, 1994, the district court granted the School Boards motion for partial summary judgment against Gegg and Integon. In written reasons for judgment, the court stated that Gegg was obligated to provide the insurance under the terms of the contract and "was not in any way relieved of this obligation." The court apparently relied upon the fact that the contract required any modification of its terms to be in writing, signed by both parties. The court further stated that Integon was solidarily liable, up to the amount of its performance of all obligations assumed by Gegg under the contract.
Following the judgment, Gegg moved for a new trial based upon alleged "newly discovered evidence." This evidence was a statement by Gegg's insurance agent that a standard builder's risk insurance policy would not have covered the fire in question. The trial court denied Gegg's motion.
Gegg and Integon appealed the district court's granting of summary judgment in favor of the School Board. Additionally, Integon had applied for writs from this court (94-C-2376) from the trial court's denial of its motion for summary judgment. A panel of this Court converted the writ application and consolidated it with Gegg and Integon's appeal.
On appeal, Gegg argued that the trial court erred in granting summary judgment because: (1) the correspondence exchanged between the parties prior to the execution of the contract effectively modified the contract as to the requirement concerning builder's risk insurance; and (2) the School Board waived its right to claim breach of contract by approving the certificate of insurance submitted by Gegg. Gegg also argued that the trial court should have granted the motion for new trial on the grounds that the impossibility of obtaining builder's risk coverage on the project renders the contractual provision void. Additionally, Integon argued that the trial court erred in holding it liable for Gegg's failure to obtain insurance because the obligation to procure insurance was to be completed prior to the execution of the contract and was not related to the performance of the work.
On appeal the summary judgment granted in favor of the School Board against Integon was reversed and summary judgment was rendered dismissing Integon from the lawsuit. Accordingly, the issue concerning Gegg and Integon's motion for a new trial on the basis of newly discovered evidence was found to be moot.
The matter was remanded to the trial court for further proceedings. On remand, Gegg submitted a Second Supplemental and Amending Petition adding: Laurance Eustis Insurance Agency, Inc., Employers Reinsurance Corporation, and Joseph A. O'Connor, Vice President of Laurance Eustis Insurance Agency, Inc., as Defendants. Gegg alleged that Eustis is liable for negligent misrepresentation and detrimental reliance. On October 3, 1996, Eustis filed a Motion for Summary Judgment arguing that as a disclosed agent for the School Board they cannot be held liable. The district court granted summary judgment in favor of Eustis.[1]
*616 This Court affirmed the summary judgment granted in favor of Laurance Eustis Insurance Agency, Inc., Employers Reinsurance Corporation and Joseph A. O'Conner, in Orleans Parish School Board v. Gegg, 97-0947 (La.App. 4 Cir. 1/14/98), 708 So.2d 425, following long standing precedent holding that an agent, acting in that capacity, avoids personal liability to a contracting third party when the third party has notice of the agency relationship and the principal has been identified.
Procedural History of No. 91-12952 on the docket of the Civil District Court for the Parish of Orleans: Orleans Parish School Board v. Michael J. Gegg d/b/a/JCM Construction CO., et al.
Following this Court's affirmance of the summary judgment dismissing the insurance agents, defendant Aetna Casualty and Surety Company submitted its trial witness list on May 21, 1998. Barbara Phillips did likewise on May 28, 1998. On March 4, 1999, the trial court granted Potomac Insurance Company of Illinois's motion to dismiss Barbara Bush Phillips, individually and in her capacity as the natural tutor of her minor sons, Jason and Brian, two of the three juveniles who allegedly set fire to the mobile classrooms, on the grounds that the debt on which the instant suit was based had been discharged by a final decree in Ms. Phillips' bankruptcy action, No. 96-15543(B) on the docket of the United States Bankruptcy Court for the Eastern District of Louisiana.
Aetna filed its answer to the School Board's Amended and Supplemental Petition on January 25, 1999. On February 9, 1999, Aetna filed an amended crossclaim against Brian and Jason Phillips, both of whom reached the age of majority during the pendency of the action. Aetna claimed it is entitled to indemnity from Brian and Jason Phillips because the fire that is the basis of the litigation was solely and proximately caused through the conduct of the Phillips boys in trespassing and/or breaking into the grounds and building of Harte School and in either intentionally or negligently starting the fire that ultimately caused the property damage that is the basis of the principal action.
On February 22, 1999, the School Board moved for a continuance of the trial, suggesting that a settlement was then pending between the School Board, Aetna and Potomac.
A reporting form in the record shows dismissal with prejudice of No. 91-12952 on March 1, 1999, describing the suit as auto-bodily injury. The form is followed by a motion to set for trial filed by Aetna's attorney on October 3, 1999 in No. 91-12952, consolidated with 91-10599, and Aetna's witness list, filed on October 29, 1999 in No. 91-12952. There are no further filings in the record of No. 91-12952.
Procedural History of No. 99-8807, Integon Indemnity Corporation v. Orleans Parish School Board and Michael J. Gegg
On May 27, 1999, Integon Indemnity Corporation filed suit against the School Board, Gegg and his wife, Jacquelyn M. Gegg. Integon alleged that in order to induce it to issue performance and payment bonds for various projects undertaken by Mr. and Mrs. Gegg and JCM, Mr. and Mrs. Gegg executed a General Indemnity Agreement agreeing to indemnify and hold Integon harmless as surety on the bonds. Pursuant to the bond, Integon made payments for outstanding claims *617 filed by Poche Welding, Inc.[2] for labor and materials. After the destruction of the buildings, the School Board sued Gregg and Integon, alleging inter alia that Integon failed to satisfy the insurance obligations imposed by the bid documents. The petition noted that this Court dismissed the School Board's suit and all claims under the contract and bonds against Integon. See, JCM Construction Company, Inc. v. Orleans Parish School Board, 663 So.2d 429 (La.App. 4 Cir.1995). Integon sought to recover its costs, expenses, consultant and attorneys' fees and out-of-pocket expenditures, including material and labor claims. Integon claimed damages against Mr. and Mrs. Gregg in the amount of $44,256.51 and against the School Board in the amount of $17,475.26.
The School Board answered on August 6, 1999, denying liability. Mr. and Mrs. Gegg filed an answer on November 22, 1999, denying liability, and filed a third party demand against the School Board for indemnity alleging that the sole cause of the damages claimed by Integon was the School Board's fault in wrongfully and in bad faith breaching its contract and filing suit against Gegg d/b/a JCM; in misrepresenting to Gegg d/b/a JCM that the precontractual obligations had been met; in representing to Gregg that the insurance he obtained relative to the November 17, 1989 contract was sufficient, to the detriment of Gregg, d/b/a JCM; violating the Louisiana Unfair Trade Practices Act, and other acts of negligence and/or fault to be shown at trial.
On December 1, 1999, the trial court ordered this matter consolidated with No. 91-10599 and No. 91-12952, all on the docket of the Civil District Court for the Parish of Orleans.
On December 30, 1999, the School Board filed its answer to the Geggs' thirdparty demand, denying liability. Integon filed its witness list on February 4, 2000.
On March 10, 2000, Integon filed a Motion for Summary Judgment. On March 24, 2000, the Geggs, d/b/a JCM, filed a Motion for Summary Judgment on his indemnity claim against the School Board. On March 28, 2000, the School Board filed a motion to dismiss the Geggs's Motion for Summary Judgment as untimely. The School Board contended that the trial having been set for April 10, 2000, and the Motion for Summary Judgment having been set for expedited hearing on March 31, 2000, the judgment could not be rendered at least ten days prior to trial as required by LSA-C.Civ.Pro. art. 966B and 966D. Furthermore, counsel for the School Board contended that he was served with a copy of the Motion for Summary Judgment on March 27, 2000, in violation of the ten-day notice requirement set forth in LSA-C.Civ.Pro. art. 966B.
The summary judgment motions and the School Board's exception of res judicata[3] were heard on June 23, 2000[4]. The trial court entered judgment on July 10, 2000 denying the School Board's exception of res judicata; granting Integon's Motion for Summary judgment against the School Board in the amount of $17,474.26 plus interest from the date Integon paid Poche, *618 and costs of these proceedings; granting Integon's Motion for Summary Judgment against the Geggs d/b/a JCM in the amount of $30,967.31 plus interest and attorneys' fees as provided in the General Indemnity Agreement; and granting the Motion for Summary Judgment filed by the Geggs individually and by Mr. Gegg d/b//a JCM against the School Board for all amounts owed to Integon pursuant to this judgment plus all costs incurred by the Geggs individually and by Mr. Gegg d/b/a JCM, and interest on all amounts owed by the School Board to the Geggs and JCM.
In its reasons for judgment, the trial court noted that on October 12, 1995, this Court held that the School Board's acceptance of Gegg's Certificate of Insurance precluded any question about the sufficiency of Gegg's insurance coverage, and that Integon was not obliged to guarantee Gegg's pre-contractual obligation to obtain insurance. Since there were no other claims related to Gegg's performance of the contract, Integon was dismissed from the lawsuit. JCM Const. Co., Inc. v. Orleans Parish School Bd., 663 So.2d 429 (La.App. 4 Cir.1995). On January 28, 1999, the trial court, adopting the appellate opinion as the law of the case, granted Gegg's Motion for Summary Judgment dismissing the School Board's performance related claims against him. On September 27, 1999, the trial court granted Gegg's Motion for Partial Summary Judgment on his detrimental reliance claim.
The trial court addressed the Integon subrogation claim and held that under both a legal or conventional theory of subrogation, Integon was entitled to indemnity. Once it paid the debt to Poche, Integon became legally subrogated to the contractor's rights including recovery against the School Board's retained fund. In addition, Integon received a written assignment of its claim, providing Integon with conventional subrogation.
The trial court then found that the liability incurred by Gegg under the terms of the Integon General Indemnity Agreement are part of Gegg's claim for damages against the School Board. The trial court granted Gegg's Motion for Partial Judgment on his detrimental reliance claim on September 27, 1999, having found that he reasonably relied on the School Board's representations that his insurance coverage was sufficient for performance of the contract. The trial court had found that the facts clearly indicated that, had the School Board not improperly brought an action against Gegg and Integon for Gegg's alleged failure to perform a precontractual obligation, Gegg would have been capable of procuring insurance bonds indefinitely. Likewise, had the board not improperly brought the action, Gegg would not have been called upon to indemnify Integon for its expenses and attorneys' fees. The trial court specifically found these amounts to have been part of Gegg's overall damages.
The trial court found additional justification for its judgment in favor of Gegg and against the School Board in Article 22 of the contract between Gegg and the School Board, which provides:
If either party to the contract should suffer damage in any manner because of any wrongful act or neglect of the other party, or anyone employed by him, then he shall be reimbursed by the other party for such damage.
The trial court found the School Board's suit against Integon to have been a "wrongful act" under the terms of the contract, entitling Gegg to reimbursement for the damages incurred in having to indemnify Integon for its defense of the School Board's suit.
*619 The trial court notified the parties of the judgment by mail on July 10, 2000.
Procedural history of No. 91-10599, JCM Construction Co., Inc. v. Orleans Parish School Board
On August 4, 1997, the trial court and the parties entered an initial trial order in this case, and trial was set for January 12, 1998. The trial date was continued because of the pending appeal of the dismissal of the insurance agents and consultants. A new trial order was issued on May 12, 1998, setting the matter for pretrial telephone conference on May 12, 1998 and for conference on September 1, 1998 for the purpose of selecting a trial date.
On June 26, 1998, Gegg filed a Motion for Partial Summary Judgment dismissing the School Board's claims regarding the sufficiency of his insurance coverage. Gegg contended that this Court's holding that the School Board's acceptance of Gegg's certificate of insurance precludes any question about the sufficiency of Gegg's insurance coverage moots any claim by the School Board against Gegg for failure to procure appropriate insurance. By consent judgment dated July 31, 1998, this motion was granted, dismissing with prejudice the School Board's claim for Gegg's alleged failure to procure sufficient insurance, including but not limited to builder's risk insurance for fire, extended coverage, vandalism and malicious mischief.
A new pre-trial order was issued on October 8, 1998, setting trial before a judge on February 25, 1999. On December 9, 1998, Gegg filed a Motion for Partial Summary Judgment regarding Gegg's performance obligations arising from the work of moving and/or renovating the two portable classrooms in accordance with the construction contract entered into by Gegg and the School Board. Gegg contended that this Court's holding that Integon be dismissed as a matter of law in the absence of any breach by Gegg of the construction contract precludes the School Board from asserting any claim against Gegg arising from his performance of his contractual obligations. On January 11, 1999, the School Board filed a reply brief in the trial court, alleging the existence of disputed issues of material fact concerning Gegg's performance under the construction contract. Gegg replied, relying on the Louisiana law of the case doctrine as set forth in Sanders v. Posi-Seal Intern., 95-0701 (La.App. 4 Cir. 2/23/96), 668 So.2d 742. According to Gegg, this Court's finding that Integon had no liability on its performance bond conclusively determined that Gegg had performed his contractual obligations. The School Board then filed the affidavit of its employee, Kenneth J. Ducote, Ph.D. As Director of Facility Planning for the School Board, he attested that Gegg's work under his contract with the School Board had not been accepted prior to the fire, and that the day of the fire Gegg was performing work involving use of flammable liquids in the buildings where the fire occurred.
By judgment dated January 28, 1999, the trial court granted Gegg's Motion for Partial Summary Judgment and dismissed with prejudice all School Board claims against Gegg, d/b/a JCM regarding the performance of the contract work. The trial court relied on the law of the case doctrine, finding that where the parties had their day in court, the same issue will not be relitigated, thus promoting both consistency of result in the same litigation and efficiency and fairness to both parties by affording a single opportunity for argument and decision of the matter at issue. The trial court found that as a matter of law, our ruling in JCM Const. Co. v. Orleans Parish Sch. Bd., 95-0567, 95-0568 *620 (La.App. 4 Cir. 10/12/95), 663 So.2d 429 precludes the School Board from asserting any claim against Gegg d/b/a JCM arising from performance or non-performance of the construction contract on which Integon wrote its bond. The trial court noted that Integon obliged itself to guarantee Gegg's performance of the contract, and that this Court determined that the School Board's claims against Integon should be dismissed in their entirety. Thus, had the question of Gegg's performance not been completely resolved by this Court, Integon would not have been dismissed with prejudice from the litigation on October 12, 1995.
On December 29, 1999, the trial court granted the School Board's motion to dismiss its claims against Barbara Bush Phillips, individually. On January 8, 1999, the School Board filed an amended and supplemental petition to add as defendants Brian and Jason Phillips, both of whom had attained the age of majority during the pendency of the litigation, and to delete all reference to Barbara Bush Phillips as their natural tutrix. The Phillips boys answered with a general denial, incorporating relevant portions of their mother's earlier filed answer.
The trial court set a status conference for May 4, 1999. On May 17, 1999, Gegg filed a Motion for Partial Summary Judgment on the following grounds:
1. Gegg justifiably relied on the School Board's representations that his insurance coverage was sufficient;
2. The School Board breached its contract with Gegg by failing to pay him sums due under the contract and by suing him for failure to procure the proper insurance;
3. The School Board negligently misrepresented to Gegg that he had met the pre-contractual obligations of the contract, causing Gegg damage;
4. The School Board had no legitimate interest in filing suit against Gegg or Integon, the act of which constitutes an abuse of rights for which Gegg is entitled to damages;
5. The School Board invaded Gegg's business interest by suing Integon and improperly and maliciously influencing it not to deal with Gegg.
Accordingly, Gegg claimed that the only issue remaining was the extent of his damages.
In support of his motion, Gegg submitted the affidavit of Idania Hunter, bond underwriter for Metropolitan Specialty Underwriters, Inc. and authorized representative of Integon. Ms. Hunter attested that as a result of the School Board's lawsuit against Integon, Integon declined to extend additional surety credit to Gregg. Furthermore, following Integon's declination to extend surety credit to Gregg, she initiated an investigation to locate additional sureties to provide Gregg a surety bond. Because of the pending School Board litigation, she was unable to locate any other surety company that would provide Gregg surety credit. The School Board filed a motion to strike the affidavit.
The School Board filed another affidavit by Dr. Ducote in opposition to this Motion for Partial Summary Judgment. In his affidavit, Dr. Ducote attested that Poche invoiced Gegg a total of $16,180.80 plus applicable taxes for miscellaneous steel work on the project. Dr. Ducote referred to exhibits not in the record showing he approved payment to Gegg of $1,027 for additional steel work subcontracted to Poche, and that Gegg had previously received $15,473 less ten percent retainage for miscellaneous steel work performed by Poche.
*621 On the same day, the School Board filed exceptions of no cause or right of action as follows:
1. Failure to state a cause of action for detrimental reliance;
2. Failure to state a cause of action for negligent misrepresentation;
3. Failure to state a cause of action or right of action for unfair trade practices;
4. Failure to state a cause of action for negligent or intentional interference with contractual or business relations or invasion of a business interest;
5. Failure to state a cause of action for malicious prosecution;
6. Failure to state a cause of action for abuse of rights;
7. Failure to state a cause of action or right of action for the balance of the contract sum; and
8. Failure to state a cause of action for bad-faith breach of contract or recovery of bad-faith damages.
By judgment dated September 27, 1999, the trial court denied the School Board's exceptions of no cause and no right of action and its motion to strike Ms. Hunter's affidavit. The judgment also granted Gegg's Motion for Partial Summary Judgment.
On June 11, 1999, Gegg filed an unopposed motion to continue the trial because of the recently filed Integon suit against Mr. and Mrs. Gegg and the School Board (No. 99-8807, Civil District Court for the Parish of Orleans). In reasons for judgment, the trial court noted that in order to prevail in his claim for detrimental reliance, Gegg must prove (1) that the School Board made a representation by conduct or work; (2) that he reasonably and justifiably relied on that representation; and (3) that his reliance on the representation caused him to suffer some detriment. Babkow v. Morris Bart, P.L.C., 98-0256 (La.App. 4 Cir. 12/16/98), 726 So.2d 423. Based on the facts presented, the trial court found that the School Board on at least two occasions represented to Gegg that his certificate of insurance met their insurance requirements. These representations were made in a letter dated November 16, 1989 from the School Board's insurance consultant to Gegg, and directly when Gegg executed the construction contract. Prior to execution of the contract, the School Board's notary public wrote to Gegg advising him the contract could not be executed unless and until Gegg furnished the insurance consultant with proof of proper insurance coverage. There is no dispute that Gegg submitted certificates of insurance to the consultant, who notified Gegg in the November 16, 1989 letter that the certificates of insurance met the School Board's requirements. The School Board's notary then permitted Gegg to execute the contract. The trial court concluded that the School Board thus represented to Gegg by word and action that his coverage was sufficient.
The court found that Gegg's reliance on these representations was reasonable and justified. Gegg had no reason to question the School Board's assurances that his certificates of insurance met the requirements. Gegg's own deposition testimony confirms that he did not question the School Board's determination, and therefore did not obtain additional insurance after having received the consultant's approval. The consultant's own testimony shows he was of the opinion that Gegg's insurance was sufficient. The trial court also relied on this Court's opinion finding that the School Board's acceptance of the certificate of insurance precludes it from challenging the sufficiency of Gegg's coverage. JCM v. Orleans Parish School Board, supra, 663 So.2d at 431.
*622 The trial court found that Hunter's uncontroverted affidavit proved that it is the custom and practice of the surety bond industry to deny surety credit to an applicant whose previous bond was the subject of a lawsuit. She also established that this was Integon's practice, and that, in fact, she had not been able to obtain a waiver of that policy from Integon, even though Integon had issued seventy-two non-problematic surety bonds to Gegg in the past. Furthermore, Ms. Hunter was unable to obtain a bond for Gegg from any other surety source.
From these facts, the trial court concluded that the failure to secure a surety bond precluded Gegg from procuring municipal contracts, the vast majority of his construction-based income for the previous five years. Clearly, had the School Board not brought this improper action against Gegg and Integon, Gegg would have been capable of procuring surety bonds, and by extension, municipal construction work, indefinitely.
The trial court denied the School Board's exceptions under the Louisiana Unfair Trade Practices act, noting that this exception had been heard and denied previously by the trial court on June 21, 1996.
On October 27, 1999, the parties and the trial court executed a new trial order, setting the trial on the merits on April 10, 2000. On November 3, 1999, the School Board filed a memorandum apparently at the request of the trial court regarding certification of the September 27, 1999 judgment granting partial summary judgment. The School Board noted that the suspensive appeal delay would expire on November 3, 1999, and referred the trial court to this Court's opinion in Jackson v. America's Favorite Chicken Co., 98-0605 (La.App. 4 Cir. 2/3/99), 729 So.2d 1060.
On January 19, 2000, Aetna moved for an order in limine preventing the School Board from introducing at trial evidence pertaining to the valuation of property damages sought under a tort theory of liability other than evidence proving the actual cash value of the damaged property as of the date of its destruction, citing a line of Louisiana jurisprudence denying replacement cost damages. See, Hammett v. New Orleans Diamond and Jewelry Wholesalers, Inc., 580 So.2d 1077, 1082 (La.App. 4 Cir.1991); State Farm Mut. Ins. Co. v. Berthelot, 709 So.2d 1053, 1055 (La.App. 4 Cir.1998). Aetna filed a similar motion on March 28, 2000.
The parties executed a new pre-trial order on July 20, 2000, fixing the case for trial on the merits on October 4, 2000. Following an unopposed motion for continuance filed on October 26, 2000, on October 23, 2000, the case was fixe by priority setting for trial on June 4, 2001. By pre-trial order dated May 3, 2001, the case was reset for trial by priority on October 10, 2001.
On September 10, 2001, the trial court, on the School Board's motion, dismissed all of the School Board's claims against Gegg, JCM, Aetna, Brian, Jason and Barbara Phillips and Potomac by reason of settlement, reserving the School Board's pled defenses against the claims of Gegg and JCM.
The matter was tried on the merits on October 10, October 15 and October 16, 2001. On the morning of October 10, counsel for the School Board addressed the trial judge:
[T]here is another matter, just for the sake of clarity as to what we are here about today, ... but we are trying damages only. Liability has been determined on motions earlier. Whatever happens todayAnd, I think all parties understand thisthe entire matter would be *623 appealed because we have contested and yet contest the findings of liability.
THE COURT:
I understand.... The issue as to liability was handled and ruled on by Judge Kim Boyle
SCHOOL BOARD COUNSEL:
Judge Love in a series of judgments. There are about four judgments.
THE COURT:
Let me ask you a question. Why is it that we have not alreadyYou've made a choice you want to go ahead and have the trial and bring the issue on appeal not on the limited issue of liability, but on the issue of liability and whatever issue comes as a result of damages:
SCHOOL BOARD COUNSEL:
One time as opposed to piecemeal appeals.
GEGG COUNSEL:
As a practical matter, one of the judgments is a final judgment.
THE COURT:
Which one?
GEGG COUNSEL:
The Integon.
THE COURT:
The issue of liability?
GEGG COUNSEL:
Well, I think that's debatable whether or not it's a final judgment, but it's the School Board's position they're going to appeal it.
THE COURT:
My only concern is, if we're going to appeal the issue of liability, I would rather do it one time, and if the Fourth Circuit kicks it back and says it should be tried in open court as opposed to done on motions, we would have a full trial on the issue of liability and on the issue of damages rather than just damages [sic]. Make sense? I mean, if, in fact, the Fourth Circuit comes back and says it was unproperly [sic] done in terms of the issue of liability and it should not have been disposed of on motions because no testimony, ..., was taken ... my concern is, when you raise the issue as to appeal, my thought is that I want to only do it one time, also.
The court then went off the record, and when the record was begun again, Gegg's counsel stated his belief that the motions on liability are final judgments, a notion with which counsel for the School Board disagreed. Counsel for the School Board then suggested, "We would ask the Court to issue a judgment orto that effect or an order or something to that effect so that we can apply to the Fourth Circuit as Your Honor has indicated that we should." The trial court then advised counsel on the record that it would issue an order
as to the issue of liability in this matter as being a final judgment, and the Court will proceed to hear the issue as to damages in this matter. The Court is presently ready to proceed with trial. However, I understand, counsel, you're asking me for leave to take an emergency writ?
Counsel for the School Board replied, "No, Your Honor. We are ready to try the issue of damages here today as"
The trial judge interjected, "With the understanding that the finalthat there is a final judgment on the issue of liability." School Board counsel disagreed. At that point, the trial court advised counsel that the only way he would not proceed that day was if the School Board intended to take an emergency writ to have this Court review the issue as to whether or not the liability partial summary judgments should be viewed as final judgments. The trial court gave counsel seventy-two hours to apply for a writ, and advised counsel the *624 trial would begin on the following Monday. The trial court asked counsel to prepare a judgment as to the finalization of the liability issue, and Gegg's counsel agreed to do so, and to send a facsimile to School Board counsel.
On October 11, 2001, the trial judge entered an order, apparently on the trial court's own motion[5] ordering "that the prior judgments on the issue of liability in this matter rendered and signed by Judge Terri Love constituted final judgment [sic] when signed."
On October 12, 2001, the School Board filed a motion for a devolutive appeal and, alternatively, an application for supervisory writ[6]. The School Board contended that the October 11, 2001 judgment is inconsistent with and violative of LSA-C.Civ.Pro. arts.1915 and 966 since the judgments to which it relates were never designated final with an express determination that there was no just reason for delay. Furthermore, the School Board alleged that the judgment of October 11, 2001 deprives it of its right to appeal the partial summary judgments upon completion of the entire case. The trial court granted the School Board's motion and order for devolutive appeal or, alternatively, application for supervisory writ on October 15, 2001.
On November 29, 2001, the trial court entered judgment with reasons, finding the law and evidence in favor of Gegg d/b/a JCM and against the School Board. The trial court made the following factual findings:
1. JCM sustained both certain and determinable economic losses from 1991 until 1994;
2. Michael J. Gegg mitigated his loss when he became gainfully employed in 1995;
3. Gegg's 1995 employment income was not in any way equal to the profits that resulted from his business's construction contracts;
4. The court used the 1995 employment to quantify the degree of damages sustained by Gegg;
5. The loss Gegg sustained was caused by his and JCM's inability to secure surety credit and bonding;
6. In weighing the credibility of the witnesses at trial, the court finds that JCM's inability to secure the necessary funds and bonding for its construction projects was caused by the lawsuit filed by the School Board against JCM and Integon.
7. Gegg d/b/a JCM is entitled to damages in the amount of $90,354.00 with interest from the date of judicial demand and costs of these proceedings.
The judgment of November 29, 2001 is the only post-trial judgment in the record as an original.
On June 27, 2002, counsel for Gegg filed a motion in this Court to supplement the record to include, inter alia, a copy of the trial court's notice of filing judgment dated November 19, 2001, and the trial court's judgment of November 9, 2001. According to that judgment, Gegg d/b/a JCM was awarded $663,152 with interest from the date of judicial demand and all costs of these proceedings. Gegg's motion also supplements the record with a copy of the trial court's order ex proprio motu of November 27, 2001 vacating and setting aside the November 9, 2001 judgment.
*625 Attached to the School Board's Request for Judicial Notice filed in this Court on January 8, 2003 is a copy of a notice of signing judgment dated January 8, 2003 and a judgment of the trial court dated January 8, 2003 granting the School Board's motion for new trial and vacating the trial court's judgment of November 9, 2001. According to the judgment, it was rendered in open court following a hearing on December 13, 2002, and read and signed in chambers on January 8, 2003.
On February 4, 2002, Gegg filed a motion and order for devolutive appeal, alleging that on November 9, 2001, the trial court rendered judgment in his favor in the amount of $663,152.00[7]. On November 27, 2001, the trial court on its own motion, vacated the judgment of November 9, 2001 and on November 29, 2001 entered the judgment noted above, reducing the judgment to $90,354.
On February 8, 2002, the School Board filed a motion and order for devolutive or, in the alternative, suspensive appeal, alleging that it received no notice of the judgments of November 9, 2001 and November 29, 2001. The School Board admitted having received a telephone call from the trial court's clerk at an unspecified time advising that a judgment had been issued in error, that it was to be ignored, and would be vacated. The trial court granted the School Board a suspensive appeal on February 13, 2002.

STATEMENT OF FACTS
At the trial, the parties stipulated that the School Board filed suit against Gegg d/b/a JCM in June 1991[8], and that $17,603.00 remains unpaid under the contract. Furthermore, Gegg lost his bonding capability in June of 1991.
Michael J. Gegg testified that he had a bachelor's degree from Marquette University and in 1989 was self-employed as the proprietor of JCM Construction Company. The company had been formed in either 1984 or 1985. Gegg had between twenty and twenty-five years' experience in the construction business. When he came out of military service in 1963, he went to work as a cost analyst for Avondale Shipyards, where he continued for two to three years. He kept track of control costs and took corrective measures when a given area began to experience losses.
A few years later he was offered and accepted what he referred to as a "dream job" as an estimator for a construction company. The firm for which he worked was engaged in commercial construction of office buildings, schools and subdivisions, including underground drainage, sewerage and water work. When that company closed its doors, he found a job as an estimator and project coordinator with Brown and Root Construction Company in Belle Chasse. He estimated jobs, supervised and built projects. He then worked for Bernard and Burke as an estimator on large petrochemical projects, then worked as a field engineer for J.A. Jones at the nuclear plant in Taft, Louisiana. Subsequently, he was put in charge of the drafting department, determining monthly work progress. The department of which he had charge turned the job around from losing a million dollars a month to being profitable. As that job was coming to an end, Jones advised him he could apply for a new project in Oregon or stay in New Orleans. He then went to work for RTL in Norco, Louisiana as an estimator and project coordinator for petrochemical *626 plants. He worked for RTL for almost six years, then went to Baton Rouge in 1984 to take a licensing test to become a licensed general contractor. He passed both parts of the licensing examination and met the financial threshhold and experience requirement. He received his license and held a valid contractor's license at the time of the trial.
When he first went into business on his own in 1985, he did not have sufficient capitalization to obtain performance bonds, but worked with the Small Business Administration to obtain bonding for his work. He worked with bonding broker Idania Hunter and was able to obtain bonds. His initial bond limit was $100,000.00, but this limit was raised in August 1990 to $160,000.00. He provided annual financial reports to his surety.
He did primarily municipal work from 1985 too 1990. He performed jobs for the Jefferson Parish School Board renovating buildings, adding classrooms, paving, site improvements, canopies, sidewalks, three parks for the City of New Orleans and a couple of small buildings. He acquired a contract with Advanced Equipment in California pursuant to which he installed their large operable walls at the Ernest N. Morial Convention Center. The Advanced Equipment contract required bonding, as did all of his work between 1985 and 1990.
As proprietor of JCM, Gegg was accountant, bookkeeper, clerk, secretary, payroll officer, monitor of accounts payable and receivable, estimator, field engineer and supervisor and purchaser. He also picked up materials for his crew. He operated the business out of his double garage, which he converted into an office and warehouse. His wife often helped him when he was putting bids together and gave him moral support.
Gegg became involved in public works because of the large pool of work. Furthermore, if he could produce a bond and was the best bidder, he would not be denied the work. Private bid work was often lost to friends or family of the owner.
Gegg produced financial statements for 1986, 1987, 1988, 1989 and 1990. His accountant, Mr. Peter Joseph Graffagnino, Jr., Certified Public Accountant, died on March 23, 2001[9], and had been under subpoena to testify at the three previous trial dates. The trial court admitted the statements into evidence. The balance sheets showed net income of JCM for 1986 of $41,785; for 1987 of $29,441; for 1988 of $43,922; for 1989 of $40,838[10] and for 1990 of $38,560. On the basis of the reviewed 1989 statement, the Small Business Administration and Integon increased Gegg's bonding limit to $160,000.00. These balance sheets were prepared using the accrual method of accounting,[11] and were not at any time rejected by either the Small Business Administration or Integon.
Gegg testified that in August 1990, JCM was in its strongest financial position. He had just received notice of substantial completion of the Alice Harte school job for $103,000.00. He was mobilizing to start two new jobs totaling just over $240,000.00, on the Ernest N. Morial Convention Center and on the Pontchartrain Center in Jefferson Parish, to be completed in 1990, and his bonding capacity had just been increased to $160,000.00. The *627 volume of work in 1990 would have been double the volume in 1989.
When the School Board failed to pay the remaining $17,603 on the Harte contract in August or September of 1990, Gegg's bank stopped his line of credit. The general contractor on the Convention Center job, Broadmoor, expected JCM to perform its work in August and September 1990, but at that point, JCM's bank credit had been discontinued. Gegg produced Hartman Engineering, Inc.'s letter of September 19, 1990, indicating the Pontchartrain Center project would soon be ready for JCM to begin work. Gegg's mother-in-law allowed Gegg to place a mortgage on her property, which was completed by the end of September, but the loss of his bank line of credit required him to postpone the work for about three months. He began work on the Convention Center during Thanksgiving holidays of 1990, about two months after he had wanted to begin, and completed the work on December 31, 1990. He was concerned that if he were to have missed the completion date, he would have incurred demurrage charges of $5,000.00 per day. He installed tracks at the Pontchartrain Center during the Christmas holidays and finished that job in February or March of 1991. He then installed the storage area for stacking doors at the Convention Center in April 1991.
Gegg described the School Board lawsuit as a fatal blow to JCM from which he never recovered. He lost and never regained his ability to obtain bonds, and was thereafter unable to bid for any public works contracts. At the end of 1991 and 1992 he was able to get jobs valued at less than ten percent of the work he performed in 1990. He also lost his lucrative contract with Advanced Equipment because he had lost his ability to produce business for the company. Gegg produced the company's letter dated June 6, 1993, terminating their business relationship immediately due to an absence of activity. All his previous work for Advanced Equipment had required surety bonds.
Because of the loss of ninety percent of his business, Gegg lost his rental property and, in order to avoid losing his home, in 1994, filed a petition for bankruptcy under Chapter 13 of the bankruptcy law[12]. Gegg's secured creditors were fully repaid, and his unsecured creditors were paid seventy-five percent of what was owed them according to the bankruptcy plan. The Geggs successfully completed the plan over a five-year period.
Gegg testified that his financial ruin caused a similar decline in his relationship with his wife. Eventually, he got a job with the State Welfare Office as a Food Stamp Eligibility Examiner and Case Manager. He did this work for six and a half years, until June 2001. He started making $1400 per month, and was earning between $2000 and $2100 when he left the job. In 2001, he saw the opportunity to complete a certified real estate appraiser program he had begun in 1993. He believed his background in construction would give him a step up in being a good appraiser. His wife is now retired, and he knew he would have to improve his income or risk having to work in the welfare office until he was eighty years old since he could not afford to retire on Social Security benefits.
Following the demise of JCM, Gegg was extremely depressed and very angry. He found it difficult to function, having lost his life's dream of having his own construction *628 company. He and his wife came close to divorcing, but she was able to get a second job and kept their lives together.
Prior to the collapse of JCM, Mrs. Gegg worked only as a school nurse for the Jefferson Parish School Board, having a Christmas holiday and summer vacation. After having been forced by economic necessity to add a second job after the loss of the company, she worked sixty hours a week. She came home Friday evening, and within a half-hour went to work at Ochsner, where she worked all day Saturday and all day Sunday every other weekend.
The loss of his bonding capacity also caused him eventually to lose his credit and about $17,500 equity in rental property in Destrehan, Louisiana. As a result of the School Board lawsuit, Integon also sued Gegg and his wife, and that suit has been ongoing for ten years.
The trial court admitted without objection copies of the construction contract between Gegg d/b/a JCM and the School Board, and of the contract specification.
On cross-examination, Gegg identified his and his wife's joint income tax returns showing the following adjusted gross income for the Geggs(AGI) and net profit from JCM business (JCM) for each of the following years,[13]
1986: $33,831 (AGI)$22,400 (JCM)
1987: $10,428 (AGI)$247 (JCM)
1988: $20,184 (AGI)$ 7,443 (JCM)
1989: $37,652 (AGI)$29,709 (JCM)
1990: $7,878 (AGI)[$7,900] (JCM LOSS)
1991: $6,731 (AGI)[$5,386] (JCM LOSS)
1992: $11,397 (AGI)[$7,436] (JCM LOSS)
1993: $32,269 (AGI)[$9,387] (JCM LOSS)
1994: $32,698 (AGI)[$17,791] (JCM/Appraisal LOSS)
1995: $46,203 [14] (AGI)[$19,066] (JCM/Appraisal LOSS)
1996: $51,736[15] (AGI)[$15,026] (JCM LOSS)
1997: $61,067[16] (AGI)[$16,094] (JCM/Appraisal LOSS)
Mr. Gegg testified that on his accountant's advice, he reported his income for tax purposes using cash basis accounting principles. The loss for 1991 includes the $17,603 that he was not paid by the School Board, and over $20,000 of indirect costs such as depreciation of equipment. The figures from 1991 through 1997 reflect the fact that although he was unable to get construction jobs during those years because of his inability to obtain a bond, he had continuing interest and indirect, legitimate expenses, including legal fees for this School Board litigation attributable to the business that were charged against his and his wife's income. The last year in which JCM generated income was 1992, when it generated gross receipts of $35,919, gross profit of $12,434 and a net loss of $7,436.
When questioned as to why he did not have any earned income between 1990 and 1995 when he became employed by the State, Gegg testified that it took him that *629 long to find a job. He was in his midfifties when he went into the job market and, as he expressed it, jobs did not "just fall in my lap." He sent out hundreds of resume and responded to advertisements. One young interviewer told him, "My dad is that age." Gegg testified to the hardship he had in trying to find employment.
When cross-examined concerning the effect of the School Board's lawsuit on his credit, Gegg testified that both the Bank of Louisiana and the Hibernia Bank's predecesssor cut off his lines of credit, and he was able to obtain funds only through his mother-in-law's making a loan, the proceeds of which she transferred to him, secured by a mortgage on her home.
Idania Hunter testified that she has been employed as a bond and surety bond underwriter since 1979. In the early 1980s she worked with Gegg to obtain his first surety bond. In that connection, he produced all his financial statements and applications which she put into order and submitted to the SBA and the corresponding surety company. Gegg qualified for surety credit through the SBA because of his character, job experience and financial statements. Gegg's bonding capacity increased as time went on, based on continuing financial statements prepared by Gegg's certified public accountant. Ms. Hunter identified the financial statements consisting of balance sheets and statements of revenues, expenses and proprietor's capital prepared by Mr. Graffagnino for JCM for the years 1986, 1987, 1988, 1989 and 1990, and testified that the statements were prepared using the accrual accounting method, acceptable to the SBA. The SBA never rejected any of the financial information provided on behalf of Gegg and JCM. The SBA would not have accepted financial reports prepared using the cash method of accounting.
Ms. Hunter identified her underwriting sheets, which were a summary of the Graffagnino financial statements. The summary shows that JCM experienced steady growth from 1984 through the end of 1989. Based on this growth, JCM's bonding capacity was increased to $160,000 per single job site. The increase was based upon the reviewed financial statement covering calendar year 1989.
According to Ms. Hunter, after the School Board sued Gegg, JCM and Integon, Gegg's and JCM's surety credit was terminated. She attempted to locate other surety credit for him, but the universal response was an absolute refusal based upon the School Board's lawsuit. When she saw Gegg after the loss of his bonding capacity, he was distraught.
On cross-examination, Ms. Hunter testified that neither the SBA nor Integon requires audited financial statements, as distinguished from compiled or reviewed statements, unless the contractor seeks a bond in excess of $500,000. Compiled statements are accepted for bonds up to $100,000, and reviewed statements are required for bonds of $100,000 to $499,999.
Jacquelyn Gegg testified that when JCM was an ongoing concern, it was operated from the Gegg home. Mr. Gegg was happy and enjoyed being self-employed. When he lost his ability to obtain JCM surety bonds, he became very angry and depressed, was humiliated and suffered loss of self-worth. He spiraled downward in unhappiness, and their marriage became filled with stress and argument. The spouses' roles reversed, and, beginning in 1993 and continuing for six years, she had to work two jobs sixty hours a week with only four days off a month. Mrs. Gegg, a registered nurse, had been employed by Jefferson Parish as a school nurse, working 35 hours per week. After the destruction of JCM, she took on additional employment *630 as a triage nurse with Ochsner Clinic's health plan, where she worked between twenty and twenty-five hours a week. She and her husband had very little contact with each other during that time. Her husband did not like the fact that their roles were reversed and she had to pay the family's bills. He felt humiliated and had relinquished his authority in the home. She found the stress very hard to carry.
Creditors called the home, the couple were served with subpoenas, and they could not make ends meet. They lost their house in Destrehan and the creditors were preparing to foreclose on the family home in which they had lived for over thirty years. They were able to stop foreclosure proceedings by filing for Chapter 13 bankruptcy protection. Under the bankruptcy plan, the couple paid off their creditors by 1999.
Mr. Gegg eventually was able to obtain employment with the State of Louisiana's Office of Family Services as a case manager operator. He did not really like this totally different job, because he had never worked in that area, but he liked the people and felt this was his chance to do something good for someone.
Because of the enormous stress of her work and health problems, Mrs. Gegg retired in May 2001 at sixty-four years of age. She confirmed her husband's testimony that he eventually left State employment at the age of sixty-three to obtain his certification as a real estate appraiser. In order to do so, he must perform two hundred fifty appraisals within a three-year period. To accomplish this, he is not presently working, but is performing the appraisals required for his appraiser's license.
Dan Cliffe, a certified public accountant who has been accepted as an expert in the fields of economic analysis and the determination of economic loss in the state and federal courts in Louisiana was tendered and accepted without objection as an expert in those fields in this case. Mr. Cliffe holds bachelor's and MBA degrees from Tulane University and was among the three percent of applicants who passed the CPA exam in the first sitting. He was in private practice for sixteen years as a financial planner and analysis forecaster. For the last fifteen years, he has been a self-employed economic analyst specializing in determination of economic loss. He is a member of the American Institute of Certified Public Accountants (AICPA), the American Economic Association and the Georgia Society of CPAs. For five years he taught bank management at Loyola and Tulane Universities.
Mr. Cliffe based his analysis of Gegg's economic loss on his birth date, level of education, date of the event and date of trial. He reviewed Gegg's personal tax returns for the years 1986 through 1995 and the financial statements prepared by Mr. Graffagnino for JCM for the years 1986 through 1990. He then developed a model of what the business would have earned had the loss of bonding capacity not taken place. He projected JCM's business income to increase three percent per year for inflation. He then identified what Mr. Gegg was able to earn as a state employee and identified the difference both in terms of past and future loss.
Mr. Cliffe used $40,838 as Gegg's base income, from the CPA's 1989 statement. JCM's net income for that year was $40,838. He used this figure because it represents what Gegg lost, that is, the NET income from the business. He focused on 1989 because the previous three years were aberrationally difficult economic times in the New Orleans area. Those years would be prejudicial if included in a wage base because they are not representative *631 of normal economic times in New Orleans, and history has shown that the local economy has improved since 1989. Mr. Cliffe testified on cross-exmination that another valid reason for using 1989 figures lies in the fact that the 1989 statements prepared by Mr. Graffagnino represented a reviewed statement, which has a higher level of assurance that the earlier compiled statements.
Mr. Cliffe used the Graggagnino balance sheet figures rather than the income tax figures because the former reflect generally accepted accounting principles (GAAP) to match revenues and expenses.
The generally accepted accounting principles were developed to provide assurance and reaqssurance to the public about what financial statements actually meet or represent. The profession recognizes that a fair representation of the identification of income is the matching of expenses to the revenues that those expenses generate.
The balance sheets and income statements were prepared using the accrual method of accounting. This distinguishes the GAAP (accrual) financial statements from the income tax returns, which do not reflect generally accepted accounting principles and are prepared based on the cash method of accounting. Mr. Cliffe noted that the statements prepared by Mr. Graffagnino met the standards of the American Institute of Certified Public Accountants.
Accrual accounting is preferred because it is a fair reflection of what the business is actually doing, since the costs and expenses associated with revenue are matched to that revenue. Since the IRS allows, but does not require, cash method accounting for computation of tax liability, and use of cash method in 1989 resulted in a lower tax for Gegg, Graffagnino legally used the cash method in preparation of that year's tax return. GAAP, however, does not permit cash method accounting. Therefore, Mr. Cliffe used accrual accounting methodology in making his model.
Mr. Cliffe was able to quantify Gegg's past loss by identifying the income JCM would have been expected to have earned from June 1991 through the present. The NET past loss was calculated to be $364,532, after having subtracted the money Mr. Gegg earned as a state employee.
Mr. Cliffe was able to project Gegg's future loss based on his work life expectancy from specific national tables, recognizing that his financial setbacks would require him to work past his age of sixtyfour years at the time of trial to the age of seventy-one. Mr. Cliffe calculated the range of Gegg's future NET lost income to between $141,400 and $149,150. If Mr. Gegg were to work an additional two years, his total future NET lost income would be between $191,400 and $205,820.
Mr. Cliffe admitted that his conclusions do not include recognition of the loss of the Geggs's income from the Destrehan property that they testified without objection or contrary evidence was lost because of the demise of JCM.
On cross-examination, counsel for the School Board suggested that Mr. Cliffe should use cash basis accounting methodology in making his calculations. Mr. Cliffe responded that counsel was
suggesting that we overturn the entire financial world and not operate under generally accepted accounting principles. That's really what you're suggesting. Because you're suggesting that there's something wrong with the reviewed statement [of 1989]. And so you're taking a higher position of authority than the SBA itself and the bonding company and the AICPA by saying, let's just turn the world upside-down and put all faith and credit in the cash system on the tax returns. Because that's what you keep *632 bringing me back to, the tax returns. And that, it looks like to me, that's not what the SBA relied upon, it's not what the bonding company relied upon, that's not what Mr. Graffagnino certified as a reviewed statement.
* * *
These are actual figures. You have focused only on the revenue side. And in accrual accounting, he also has to recognize on an accrual basis what he owes. Now, you're implying that someone may not pay him under accrual accounting. He may not pay him. But he still has to match those under accrual accounting. So, you can't say that one is always going to be higher than the other. That is not true.... In the longer term, it's going to catch up. He [Mr. Gegg]'s not dodging anything. He's just postponing something. And that's what every redblooded American I know does: postpone the payment of taxes until he has to pay them. There's nothing wrong with that.
Douglas Tymkiw, a certified public accountant employed by Ernst and Young, testified for the School Board. He holds an undergraduate degree from the University of New Orleans and an MBA in finance from Rollins College. He eventually passed the CPA examination on the third sitting. He performed some industry training and taught as a guest professor at UNO's accounting school. He also taught a three day seminar for federal judges on understanding accounting and financial courtroom issues and at the FBI training center for their CPAs. He testified that his only qualification as an expert in court occurred the previous year before a Baton Rouge district court. The trial court qualified him as an expert in analyzing accounting and financial information. He was not qualified as an expert in economic analysis.
Mr. Tymkiv analyzed Gegg's and JCM's financial records and concluded that there was significant variability in the income generated by JCM. He also reviewed Mr. Cliffe's analysis and opined that his assumptions were inconsistent with the entirety of the accounting financial records. Finally, Mr. Tymkiv calculated damages to Gegg during the period of time when he was not employed and after he had lost the construction business.
In making his projections, Mr. Tymkiw used the income tax returns from 1986 through 1991. He made no allowance for the economic downturn of 1986 through 1988, which he admitted on cross-examination were "bad years", nor did he use generally accepted accounting practices, favoring instead the cash basis figures from the income tax returns. He criticized reviewed financial statements as being less thorough than audited statements, and noted that the cost of a reviewed statement is approximately $300 or $400 and the cost of an audited statement is in the $30,000 to $40,000 range.
In forming an opinion as to the damages sustained by Gegg d/b/a JCM, Mr. Tymkiw used the average reported cash basis income from 1988 to 1990 of $9,744, and calculated the loss from 1991 when he lost his bonding capacity through the end of 1994, because he became employed by the State in 1995. Because his state income was greater than the JCM net cash basis reported income, Mr. Tymkiw concluded that Gegg suffered no loss once he became a state employee. Mr. Tymkiw testified that in his opinion Gegg sustained a loss of past income of $32,224, and no loss of future income.
On cross-examination, Mr. Tymkiw admitted that he did not include in Gegg's income the $17,603 that Integon paid to *633 Poche for which Gegg was liable and for which the School Board had an obligation to pay to Gegg pursuant to his subrogation rights. He also testified that he had not considered the legal ramifications of the School Board's failure to make its payment to Gregg in order that Gregg could have paid Poche, avoiding Poche's suit against Integon and Integon's subsequent suit against Gegg d/b/a JCM, the latter of which led to the termination of Gegg's bonding capacity.
On further cross-examination, Mr. Timkiw testified that he based his statement that Gegg's line of credit was not cut off in the Fall of 1990 in a 1990 financial statement showing a note payable bank line letter of credit in the amount of $8,000. Mr. Timkiw admitted he had not reviewed testimony or otherwise determined the timeliness of this entry. He did not recall Gegg's testimony at trial, at which Mr. Timkiw was present, that all credit was cut off after the bonding capacity was terminated. On rebuttal, Gegg testified that when he lost his bonding in 1990, he owed money on two lines of credit, and later owed a third debt on his mother-in-law's secured loan for his benefit. The notations of interest payments contained on his income tax returns relate to debt incurred prior to the termination of his bonding capacity and credit. The mere loss of his ability to obtain additional credit did not extinguish the debts already owed on his previously active lines of credit, such as the $8,000 debt on which Mr. Timkiw relied in concluding that Gegg's "lines of credit" remained open after the School Board failed to pay the Poche claim and subsequently filed its lawsuit. Furthermore, the legal expenses noted on his income tax returns relate to this litigation, and not to his construction work.
Mr. Timkiw admitted that he eliminated consideration of the $17,603 owed to Gegg by the School Board in 1990, the fact that he lost his line of credit and was unable to complete the jobs at the Ernest N. Morial Convention Center and the Pontchartrain Center that were planned for completion in 1990 and nonetheless chose 1990 as one of the three years used to form the basis of his projections.
He testified that the payment by JCM of the $17,603 less retainage, to Poche would have negated the payment of the same amount by the School Board to JCM. However, on cross-examination, he admitted that he had not noted that the JCM debt to Poche had already been recognized as an expense on the 1991 statement. Thus, Mr. Timkiw's calculation fails to give Gegg credit for the receivable from the School Board while charging him for the company's payable to Poche.
He admitted that had JCM been able to complete the Convention Center and Pontchartrain Center jobs in 1990, the 1990 income figure could have been substantially higher, but contended that the expenses associated with the revenues had not been included; however, the statements did show expenses for that period of time.
Mr. Timkiw opined that because smaller companies generally fail more often than larger companies, he would not project income for JCM beyond three to five years.
Mr. Timkiw testified that he did not know if his firm, Ernst and Young, would give a clean opinion on the financial position and income of a company based on the cash method of accounting.

STANDARD OF REVIEW
The three partial summary judgments are reviewed de novo, using the same criteria applied by trial courts to determine whether summary judgment is appropriate. Independent Fire Insurance Company *634 v. Sunbeam Corp., 99-2181, 99-2257 (La.2/29/2000), 755 So.2d 226, 230; Rynolds v. Select Properties, Ltd., 93-1480 (La.4/11/94), 634 So.2d 1180, 1182; Schroeder v. Board of Sup'rs of Louisiana State University, 591 So.2d 342, 345 (La.1991).
The summary judgment procedure is designed to secure the just, speedy, and inexpensive determination of actions such as this. The procedure is favored and shall be construed to accomplish these ends. LSA-C.Civ.Pro. art. 966 A(2). A summary judgment shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to material fact, and that the mover is entitled to judgment as a matter of law. LSA-C.Civ.Pro. art. 966 B. The burden of proof remains with the mover. However, if the mover will not bear the burden of proof at trial on the matter that is before the court on the motion for summary judgment, the mover's burden on the motion does not require him to negate all essential elements of the adverse party's claim, action, or defense, but rather to point out to the court that there is an absence of factual support for one or more elements essential to the adverse party's claim, action, or defense. Thereafter, if the adverse party fails to produce factual support sufficient to establish that he will be able to satisfy his evidentiary burden of proof at trial, there is no genuine issue of material fact. LSA-C.Civ.Pro. art. 966 C(2).
Even before the last decade's amendments to our summary judgment law, an adverse party to a supported motion for summary judgment could not rest on the mere allegations or denials of his pleading, but his response, by affidavits or as otherwise provided by law, must set forth specific facts showing that there is a genuine issue of material fact for trial. LSA-C.Civ.Pro. art. 967; Poydras Square Assoc. v. Suzette's Artique, Inc., 614 So.2d 131,132 (La.App. 4th Cir.1993).
But the 1997 amendments go further, to change substantially the law of summary judgment. Under the prior jurisprudence, summary judgment was not favored and was to be used only cautiously and sparingly. The pleadings and supporting documents of the mover were to be strictly scrutinized by the court, while the documents submitted by the party in opposition were to be treated indulgently. Any doubt was to be resolved against granting the summary judgment, and in favor of trial on the merits. See, for example, Sassone v. Elder, 626 So.2d 345 (La.1993); Vermilion Corp. v. Vaughn, 397 So.2d 490 (La. 1981). This jurisprudential presumption against granting the summary judgment was legislatively overruled by La.C.C.P. art. 966 as amended. The amendment levels the playing field between the parties, with the supporting documentation submitted by the parties to be scrutinized equally and the removal of the overriding presumption in favor of trial.
Under the amended statute, the initial burden of proof remains with the mover to show that no genuine issue of material fact exists. However, under LSA-C.Civ.Pro. art. 966(C), once mover has made a prima facie showing that the motion should be granted, the burden shifts to the non-moving party to present evidence demonstrating that material factual issues remain. Once mover has properly supported the motion for summary judgment, the failure of the non-moving party to produce evidence of a material factual dispute mandates the granting of the motion.
The amendment to LSA-C.Civ.Pro. art. 966 brings Louisiana's standard for summary judgment closely in line with the federal standard under Fed.Rule Civ.Proc. 56(c). Hayes v. Autin, 96-287 (La.App.3 *635 Cir. 12/26/96); 685 So.2d 691, 694, writ denied, 97-0281 (La.3/14/97), 690 So.2d 41. The summary judgment law was amended by La.Acts No. 483 of 1997 to incorporate the Hayes analysis.
Under Fed.Rule Civ.Proc. 56, when the nonmoving party bears the burden of proof at trial, there is no genuine issue of material fact if the nonmoving party cannot come forward at the summary judgment stage with evidence of sufficient quantity and quality for a reasonable juror to find that the party can satisfy his substantive evidentiary burden. In construing the federal summary judgment rule, the United States Supreme Court held that summary judgment shall be granted where the evidence is such that it would require a directed verdict for the moving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). If a defendant in an ordinary civil case moves for summary judgment or a directed verdict based on the lack of proof of a material fact, the judge must ask himself not whether he thinks the evidence unmistakably favors one side or the other, but whether a fair-minded jury could return a verdict for the non-moving party on the evidence presented. Id. The Anderson court further held that the mere existence of a scintilla of evidence on the non-moving party's position would be insufficient; there must be evidence on which the jury could reasonably find for that party. In Lujan v. National Wildlife, 497 U.S. 871, 110 S.Ct. 3177, 111 L.Ed.2d 695 (1990), the court held that Fed.Rule Civ.Proc. 56 mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to the party's case and on which that party will bear the burden of proof. Berzas v. OXY USA, Inc., 29,835 (La.App. 2 Cir. 9/24/97), 699 So.2d 1149, 1152-53; Martello v. State Farm Fire and Cas. Co., 96 2375 (La.App. 1 Cir. 11/7/97), 702 So.2d 1179, 1183-84.
Ultimate or conclusory facts or conclusions of law are not to be utilized on a summary judgment motion. Dumas v. Angus Chemical Co., 31,400 p. 17 (La.App. 2 Cir. 1/11/99) p. 17, 728 So.2d 441, 452.
Argument of counsel and briefs, no matter how artful, are not sufficient to raise a genuine issue of material fact. Despite the presence of disputed facts, summary judgment will be granted as a matter of law if the contested facts present no legal issues. Likewise, allegations without substance will not support or, by analogy, defeat a summary judgment. See, Davenport v. Amax Nickel, Inc., 569 So.2d 23, 27 (La.App. 4 Cir.1990), writ denied, 572 So.2d 68 (La.1991).
A fact is material if it is essential to a plaintiff's cause of action under the applicable theory of recovery and without which plaintiff could not prevail. Generally, material facts are those that potentially insure or preclude recovery, affect the litigant's ultimate success, or determine the outcome of a legal dispute. Prado v. Sloman Neptun Schiffahrts, A.G., 611 So.2d 691, 699 (La.App. 4th Cir.1992), writ not considered 613 So.2d 986 (La.1993).
A different standard of review applies to the trial court's judgment of November 29, 2001. That judgment followed a full three-day trial on the merits. The manifest error standard will be applied to the trial court's findings in that portion of this case.
In Louisiana, a reviewing court has the constitutional duty to review both facts and law. See Cole v. State, Dept. of Public Safety and Corrections, 01-2123 (La.9/4/02), 825 So.2d 1134. However, in reviewing the factual findings of a trial court, an appellate court is limited to a determination of manifest error. Hill v. *636 Morehouse Parish Police Jury, 95-1100 p. 4 (La.1/16/96), p. 4, 666 So.2d 612, 614. Ferrell v. Fireman's Fund Ins. Co., 94-1252 (La.2/20/95), 650 So.2d 742, 745; Stobart v. State through Dept. of Transp. and Development, 617 So.2d 880 (La.1993); Arceneaux v. Domingue, 365 So.2d 1330 (La.1978).
It is well settled that a court of appeal may not set aside a trial court's or a jury's finding of fact in the absence of "manifest error" or unless it is "clearly wrong," and where there is a conflict in the testimony, reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed on review, even though the appellate court may feel that its own evaluations and inferences are as reasonable. Where there are two permissible views of the evidence, the fact finders choice between them cannot be manifestly erroneous or clearly wrong. Watson v. State Farm Fire and Casualty Ins.Co., 469 So.2d 967 (La.1985). Appellate courts must constantly have in mind that their initial review function is not to decide factual issues de novo. When findings are based on determinations regarding the credibility of witnesses, the manifest errorclearly wrong standard demands great deference to the trier of fact's findings; for only the fact finder can be aware of the variations in demeanor and tone of voice that bear so heavily on the listener's understanding and belief in what is said. Of course, where documents or objective evidence so contradict a witness's story, or the story itself is so internally inconsistent or implausible on its face, that a reasonable fact finder would not credit the witness's story, the court of appeal may well find manifest error or clear wrongness even in a finding purportedly based upon a credibility determination. However, where, as in the instant case, such factors are not present, and a fact finder's finding is based on its decision to credit the testimony of one or more witnesses, that finding can virtually never be manifestly erroneous or clearly wrong. Rosell v. ESCO, 549 So.2d 840, 844-845 (La.1989).
When there is evidence before the trier of fact which, upon its reasonable evaluation of credibility, furnishes a reasonable factual basis for the trial court's finding, on review the appellate court should not disturb this factual finding in the absence of manifest error. Stated another way, the reviewing court must give great weight to factual conclusions of the trier of fact; where there is conflict in the testimony, reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed upon review, even though the appellate court may feel that its own evaluations and inferences are as reasonable. The reason for this well principle of review is based not only upon the trial court's better capacity to evaluate live witnesses (as compared with the appellate court's access only to a cold record), but also upon the proper allocation of trial and appellate functions between the respective courts. Canter v. Koehring Co., 283 So.2d 716, 724 (La.1973).
We are instructed that before a factinder's verdict may be reversed, we must find from the record that a reasonable factual basis does not exist for the verdict, and that the record establishes the verdict is manifestly wrong. Lewis v. State through Dept. of Transp. and Development, 94-2370 (La.4/21/95), 654 So.2d 311, 314; Stobart v. State through Dept. of Transp. and Development, supra.
Although we accord deference to the fact finder, we are cognizant of our constitutional *637 duty to review facts[17], not merely to decide if we, as a reviewing court, would have found the facts differently, but to determine whether the trial court's verdict was manifestly erroneous, clearly wrong based on the evidence, or clearly without evidentiary support. Ambrose v. New Orleans Police Department Ambulance Service, 93-3099 (La.7/5/94), 639 So.2d 216, 221; Ferrell v. Fireman's Fund Ins. Co., supra.

GEGG'S FIRST ASSIGNMENT OF ERROR in 2003 CA 1077: The trial court erred in granting the School Board's Motion for New Trial and vacating its judgment of November 9, 2001 because the appeal of the November 29, 2001 judgment divested the trial court of jurisdiction[18]. GEGG'S THIRD
ASSIGNMENT OF ERROR in 2003-CA-1077: The trial court erred in annulling the judgment of November 9, 2001 on the School Board's Motion for New Trial. GEGG'S FIRST ASSIGNMENT OF ERROR IN 2002-CA-0824/-0825/-0826: The trial court erred by vacating the judgment of November 9, 2001 and signing the null and void judgment of November 27, 2001.
The only conditions under which a judgment may be amended by the trial court on its own motion are:
1. To alter the phraseology of the judgment, but not the substance; or
2. To correct errors ofcalculation. See, LSA-C.Civ.Pro. art.1951.
We have held that a final judgment may not be amended substantively unless a motion for new trial has been filed and granted. In Levron v. State of Louisiana, through the Department of Health and Hospitals, 94-2094 p. 14 (La.App. 4 Cir. 4/24/96), 673 So.2d 279, 289, the State claimed that the trial court was without authority to amend a judgment to provide for assessment of interest. Plaintiffs argued that since they were entitled to interest as a matter of law in a damage action against the state, the trial court has authority to amend the judgment pursuant to LSA-C.Civ.Pro. art.1972. However, we cited the provisions of LSA-C.Civ.Pro. art. 1951 and noted that a final judgment cannot be amended substantively unless a motion for new trial has been filed and granted. We held that the trial court had no authority to amend the judgment, even to conform with the plaintiff's legal right to interest, since it had not granted a motion for new trial prior to amending the judgment.
The facts of the instant case dictate a similar result. Here, the trial court substantively reduced the judgment in favor of plaintiff Gegg d/b/a JCM Construction Company from over $600,000 to just over $90,000. At the time of rendition of the purported judgment of November 29, 2001, neither Gegg nor the School Board had been granted a new trial. Under the clear language of the Code and consistent with our jurisprudence, the trial court had no authority to vacate the November 9, 2001 judgment or to render the purported judgment of November 29, 2001. The judgment of November 29, 2001 is a nullity and has no effect.
The next question we must address is whether the School Board's appeal, filed on February 8, 2002, is timely. Since the appeal delay following rendition of the November 9, 2001 judgment had then expired, we must consider the effect, if any, *638 of School Board counsel's allegation that he did not receive notice of the rendition of either the valid judgment of November 9, 2001 or the null judgment of November 29, 2001. The supplemental record contains a copy of a notice of signing the November 9, 2001 judgment dated November 19, 2001 and signed by the Division "M" Minute Clerk, showing the judgment was sent by mail to counsel for the School Board and to counsel for Gegg.
We note that the fact that the original November 19, 2001 notice of signing judgment and judgment of November 9, 2001 were filed by plaintiff into the record via his motion to supplement the record is probative of the fact that counsel for Gegg received the notice and judgment. Both the notices of signing the November 9, 2001 and November 29, 2001 judgments were mailed to the School Board's trial counsel, George Riess, at an address in Metairie, Louisiana. However, the pleadings uniformly indicate counsel's office was located on Lafayette Street in New Orleans. In the most recent pleading signed by Mr. Riess prior to the November 2001 judgments, his October 12, 2001 motion for devolutive appeal or, alternatively for supervisory review, his address is listed as 938 Lafayette Street, Suite 100 in New Orleans. The next reference to Mr. Reiss is found in the trial court's order of February 5, 2002 granting Gegg's devolutive appeal. At the bottom of that document is a statement requesting service on Mr. Riess at the Lafayette Street address. Mr. Riess's motion and order of appeal filed on behalf of the School Board on February 8, 2002 likewise shows his address as 938 Lafayette Street. There is no apparent reason in the record why the notices of signing the November, 2001 judgments were sent to Mr. Riess at a Metairie address. It therefore appears to this Court that the School Board did not receive notice of the November, 2001 judgments as designated by the deputy clerk for Division "M". In Riess's motion for appeal, he noted that he did not know about the November 9th and 29th judgments until he received a copy of Gegg's motion for devolutive appeal in early February of 2002. According to Mr. Riess's motion, on a date uncertain subsequent to November 9, 2000, he received a telephone call from a Clerk in Division "M" advising that a judgment had been issued in error, that it was to be ignored, and that it would be vacated. This is insufficient notice to the School Board that the judgments had been signed. Mr. Riess did not indicate that he was advised that a subsequent judgment was purportedly rendered. The service information indicates that Gegg's counsel mailed Gegg's motion for appeal on February 4, 2002. Mr. Riess filed the School Board's motion for appeal of the two November judgments a mere four days later. We find no dilatory conduct on the part of counsel for the School Board in this regard.
It appears from the record taken as a whole that the notice of the November, 2001 judgments was mailed to School Board counsel at an incorrect address. In light of that fact and against the background that appeals are to be favored, we find that the School Board's appeal of the November 9, 2001 judgment is timely and is not time barred by operation of LSA-C.Civ.Pro. art.2087 or LSA-C.Civ.Pro. art. 2123.
Gegg's alternative assignment of error in which he contends that the trial judge abused his discretion in reducing the award is moot in light of our disposition of his original assignment of error, vacating the November 29, 2001 judgment.

*639 GEGG'S SECOND ASSIGNMENT OF ERROR IN 2002-CA-0824/-0825/-0826: The trial court abused its discretion in awarding Gegg only $90,354.00 in past and future loss of income and in failing to award Gegg any damages for his mental pain and anguish following the loss of his business.
Gegg's assignment of error insofar as it claims the trial court abused its discretion in the November 29, 2001 judgment by lowering the economic award to $90,000 and in failing to award damages for mental pain and anguish is moot in light of our ruling herein vacating the November 29, 2001 judgment in its entirety.

GEGG'S SECOND ASSIGNMENT OF ERROR in 2003-CA-1077: The trial court erred when it granted the School Board's untimely Motion for New Trial.
Mr. Gegg contends that the trial court's judgment and order of January 8, 2003 granting the School Board's motion for new trial and vacating the trial court's judgment of November 9, 2001 is defective and violates LSA-C.Civ.Pro arts.1951, 2087 and 2123. According to the School Board's motion for appeal filed by Mr. Riess, the latest date on which the School Board had actual notice of the judgments of November 9 and 29, 2001 was February 8, 2002.
The School Board's motion for new trial came before the trial court in December, 2002, well after the parties filed their appeals in this Court and nearly a year after the School Board admits that it had actual notice of the rendition of the November, 2001 judgments.
The jurisdiction of the trial court over all matters in the case reviewable under the appeal is divested, and that of the appellate court attaches, on the granting of the order of appeal and the timely filing of the appeal bond, in the case of a suspensive appeal, or on the granting of the order of appeal, in the case of a devolutive appeal. Thereafter, the trial court has jurisdiction only over those matters not reviewable under the appeal. LSA-C.Civ.Pro. art.2088. Since none of the exceptions to this provision contained in article 2088 are applicable to the action taken by the trial court in January, 2003, the trial court's order granting the School Board's motion for new trial and vacating the judgment of November 9, 2001 is null and void.

SCHOOL BOARD'S FIRST ASSIGNMENT OF ERROR[19] IN 2002-CA-1456 AND FIRST ASSIGNMENT OF ERROR IN 2002-CA-0824:The trial court erred in designating as final three partial judgments entered on September 27, 1999, January 28, 1999 and July 10, 2000 that previously had been found to have been designated as not final judgments.
While we find no authority to support Judge C. Hunter King's action in retroactively designating the three partial judgments issued by his predecessor as final, appealable judgments, we note that the School Board applied for supervisory review in No.2001-C-1930, which application was consolidated with the instant appeal by order of this Court dated December 6, 2001. The issues implicit in the partial summary judgments have been briefed fully by the parties. Furthermore, there is no reason why, if Integon and Gegg are entitled to subrogation, they should be required essentially to finance the School Board's obligation for the duration of this twelve-year old litigation.
*640 This Court, en banc, took a strict-constructionist view of LSA-C.Civ.Pro. art.1915 in Jackson v. America's Favorite Chicken Company, supra, and dismissed an appeal for failure to comply with the provisions of the procedure code. However, the Louisiana Supreme Court in Evans v. Charity Hospital in New Orleans, XXXX-XXXX (La.4/20/01), 790 So.2d 8, granted certiorari and ordered this court to exercise its supervisory jurisdiction to review the merits, effectively rejecting our earlier narrow reading of the codal provision. On remand, this Court noted:
In 1980 and/or 1981, the plaintiff, Wanda Evans, was admitted to Charity, and later received a blood transfusion. In January 1999, Evans was informed that she had contracted a terminal blood disease called Hepatitis C. On June 30, 1999, the plaintiff, Wanda Evans filed a Petition for Damages against the Relator, Charity, alleging several causes of action surrounding the fact that Charity gave her a substantial amount of blood without first testing the blood to determine if the substance was free of contaminants.
After Charity was served with the petition, Charity filed an Exception of Prematurity alleging that the lawsuit should have been presented to a medical review panel pursuant to LSA-R.S. 40:1299.39 et seq. More specifically, Charity alleged in its exception that the theories of recovery in Evans' petition were for negligence, which mandated a hearing before a medical review panel prior to filing a claim in district court. Following oral arguments, the district court denied the exception. However, the judgment that was rendered by the district court was not certified as a final appealable judgment pursuant to LSA-C.C.P. art. 1915(B)(1). Nevertheless, Charity filed an appeal in this Court. Absent a final appealable judgment, we dismissed the appeal. Charity proceeded to file for writ of certiorari with the Supreme Court which was granted. On remand, this matter is before us again with the Supreme Court recommendation that this Court exercise its supervisory jurisdiction.
LAW
The Supreme Court's ruling in this case effectively has overruled this Court's decision in Jackson v. America's Favorite Chicken Co., 98-0605 (La.App. 4 Cir. 2/3/99), 729 So.2d 1060, in which it was held that this Court no longer would convert appeals from partial summary judgments that had not been certified as final by the district court to applications for supervisory writs. The Supreme Court's remand with instruction to consider this appeal under our supervisory jurisdiction reminds us, as this Court noted in Livingston Downs Racing Association, Inc. v. Louisiana State Racing Commission, 96-1215, p. 3 (La.App. 4 Cir. 6/5/96), 675 So.2d 1214, 1216 that:
the difference between supervisory jurisdiction and appellate jurisdiction is that the former is discretionary on the part of the appellate court while the latter is invocable by the litigant as a matter of right. As a general rule, the Court of Appeal does not exercise its discretionary supervisory jurisdiction in the absence of a showing that the failure to do so will result in irreparable injury. Where an appeal would provide an adequate remedy there would normally be no irreparable injury and the Court would not issue certiorari to review the judgment complained of.
As in Livingston, it is appropriate for this Court to exercise its supervisory jurisdiction in this case because dismissing this appeal would further dilute Charity's right to have its day in court. If this Court were to affirm the district court's judgment, we would, in fact, be *641 requiring a health care provider to adhere to a judgment that forfeited its right to a medial [sic] review panel without offering the said provider an opportunity to have this judgment scrutinized due to an oversight committed at the district level. Therefore, the policy created by this Court in Jackson has been overruled, and we re-establish our previous rule to reserve the right to invoke our supervisory jurisdiction on a case-by-case basis. The Supreme Court's reversal of Jackson is limited to the issue of this Court exercising its supervisory jurisdiction in converting an appeal to a supervisory writ and making a disposition thereof. Thus, we invoke our supervisory jurisdiction in the case at bar and render our disposition on the merits presented. Evans v. Charity Hospital in New Orleans, XXXX-XXXX pp. 1-3 (La.App. 4 Cir. 11/14/01), 801 So.2d 1192,1194-95.
Following the direction of the Supreme Court in the Evans case, as further elucidated in this Court's opinion on remand, we exercise our supervisory jurisdiction to consider the merits of the three partial summary judgments rendered by the trial court.

SCHOOL BOARD'S SECOND ASSIGNMENT OF ERROR IN 2002-CA-1456 AND SECOND ASSIGNMENT OF ERROR IN 2002-CA-0824: The trial court's finding that the school board filed a baseless and malicious suit is manifestly erroneous. SCHOOL BOARD'S THIRD ASSIGNMENT OF ERROR IN 2002-CA-1456 AND SCHOOL BOARD'S SECOND ASSIGNMENT OF ERROR IN 2002-CA-0824: The trial court's finding that Gegg changed his position to his detriment in reliance on a promise of future action by the School Board is manifestly erroneous.
The evidence of record clearly preponderates that the School Board filed its suit against Gegg and his surety while it knew or, in reasonable exercise of its pre-suit investigation should have known that its own notary and its own insurance consultant, acted as the Board's agent in fact, assured Gegg and, through Gegg, his surety, Integon, that the certificates of insurance supplied by Gegg to the Board's consultant and notary were adequate and fulfilled the pre-contractual requirements as they pertained to insurance coverage. In light of this knowledge, the School Board acted wrongfully in instituting suit claiming Gegg and through him Integon provided inadequate insurance coverage.
Furthermore, by the consent judgment of July 31, 1998, the School Board agreed to dismissal with prejudice of its claim for Gegg's alleged failure to procure sufficient insurance. Therefore, we disagree with the School Board's claim that the trial court's conclusions were not reasonable and were manifestly erroneous or clearly wrong.
However, as we noted earlier in this opinion, we do not review summary judgments under the manifest error standard. We have reviewed the summary judgments de novo. Our de novo review of the three partial motions for summary judgment convinces us that there was adequate uncontroverted evidence that at the time the School Board filed suit against Gegg and Integon it knew or, in the exercise of reasonable diligence should have known that its claim was baseless.
Likewise, our de novo review of the partial summary judgment finding Gregg to have met his performance obligations is well-founded. The School Board produced no evidence that Gegg failed to perform his obligations under the contract, *642 and this Court's published opinion holding that Integon should be dismissed as a matter of law on its performance bond establishes for the record in this case that Gegg met his performance obligations. Had there been any issue of material fact as to Gegg's performance under the contract, the matter of Integon's liability as his performance surety would have remained open and referred to a trial on the merits.
We also find on a de novo review that Ms. Hunter's affidavit together with Mr. Gegg's deposition testimony are uncontroverted and support the trial court's granting Gegg's motion for partial summary judgment finding Gegg to have relied to his detriment on the School Board's representations that his insurance coverage was adequate, that the School Board negligently misrepresented to Gegg that he had met his pre-contractual obligations, and, as discussed previously, that the School Board had no legitimate interest in filing suit against Gregg and Integon, thus giving rise to a valid claim for abuse of rights. Ms. Hunter's uncontroverted affidavit established the material fact that the School Board's suit against Integon and Gegg resulted in the termination of Gegg's ability to obtain a bond, giving rise to Gegg's entitlement to damages to be assessed at trial.

SCHOOL BOARD'S FOURTH ASSIGNMENT OF ERROR IN 2002-CA-1456 AND SCHOOL BOARD'S THIRD ASSIGNMENT OF ERROR IN 2002-CA-0824: The trial court's award of damages in excess of $30,118 constitutes an abuse of discretion and is manifestly erroneous.
We shall first address the issue of whether the trial court was manifestly erroneous in making its award of economic damages. As to the claim for past and future lost income, the issue turns on the testimony given by the expert witnesses.
In making his projections, Mr. Tymkiw, the School Board's expert, used the income tax returns from 1986 through 1991. This did not take into account the significant economic downturn from 1986 through 1988 to which Mr. Cliffe, Gegg's expert, testifed. Furthermore, Mr. Tymkiw's use of the cash basis figures on the income tax returns does not follow generally accepted accounting principles. He criticized reviewed financial statements as being less thorough than audited statements, and noted that the cost of a reviewed statement is approximately $300 or $400 and the cost of an audited statement is in the $30,000 to $40,000 range. However, he was comfortable using the income tax return figures which were neither audited nor reviewed, in making his projections. Furthermore, using his examples of the relative costs of the reviewed and audited statements, it is clear that it would not be economically feasible for JCM to have spent more than a year's profit to obtain a single audited statement. Indeed, Mr. Timkiw admitted on crossexamination that for a company the size of JCM "you would never do a full-blown audit."
Our review of the testimonies of the plaintiff's expert economic analyst and of the School Board's financial statement analyst in their entirety and against the background of the record as a whole convinces us that the choice between their views of the damages sustained by Gegg d/b/a JCM made by the trial court in its judgment of November 9, 2001 was not manifestly erroneous or clearly wrong. Mr. Cliffe relied on figures developed in accordance with generally accepted accounting practices. Mr. Tymkiw did not. We find the trial court's choice to accept Mr. Cliffe's model and his conclusion to be *643 reasonable and supported by the evidence. As the trial court noted in its November 9, 2001 judgment, there was no evidence that any of the Graffagnino records were inaccurate or incomplete. The trial court also found that Mr. Tynkiw's analysis overlooked the fact that JCM, a sole proprietorship, is not separate from Mr. Gegg. Its losses Cliffe opined were directly dependent on Gegg's ability to work, and the standard methodology, as testified to by Mr. Cliffe, is to forecase such losses as long as Mr. Gregg can work. The trial court found the most telling flaw in Mr. Tymkiw's analysis was the fact that he did not know if his employer, Ernst and Young, would have used the cash method to evaluate JCM's financial condition.
The trial court found that Mr. Cliffe's reliance on the Graffagnino records was reasonable and logical, and that the accrual method of accounting gave results that were "far more accurate" in evaluating the financial position of the company.
Using the average of Mr. Cliffe's calculations as accepted by the trial court, plaintiffs suffered a past economic loss of $364,532 and a future economic loss of $198,610, based on the uncontroverted evidence that Mr. Gegg will work to age 71.
The trial court was manifestly erroneous and clearly wrong in failing to consider the uncontroverted evidence of the School Board's failure to pay $17,603 for work done by Poche, and the uncontroverted evidence of Gegg's loss of $17,500 in equity on his Destrehan property, and we therefore add $35,103 to the award of economic damages.
In order to determine the validity of the School Board's claim that Gegg is not entitled to an award to compensate him for his mental pain and suffering, we shall address the underlying issue of whether hedonic damages may be assessed under the facts of this case.
The conclusions of this Court and of the trial court concerning the School Board's liability to Gegg establish that the liability is founded not only on breach of contract, but also on detrimental reliance, negligent misrepresentation, unfair trade practices, negligent and/or intentional interference with contractual or business relations or invasion of a business interest, malicious prosecution, abuse of rights, and bad faith damage to JCM and Gegg.
Our jurisprudence indicates that Gegg is limited to recovery of economic damages on his claim for detrimental reliance on the School Board's apparent approval of his insurance coverage. In Babkow v. Morris Bart, P.L.C., supra, we held that under the detrimental reliance doctrine established by Louisiana law, a party is permitted to recover economic harm whenever
"the defendant made a representation by word or conduct upon which the plaintiff justifiably relied and because of which plaintiff changed his position to his detriment." Maraist, Louisiana Tort Law § 20-1, p. 446 (Charlottesville, VA: Michie Law Publishers, 1996). The detrimental reliance doctrine is "designed to prevent injustice by barring a party from taking a position contrary to his prior acts, admissions, representations, or silence." Orr v. Bancroft Bag, Inc., 29,046 (La.App. 2 Cir. 1/22/97), 687 So.2d 1068, 1070 Andrus v. Andrus, 93-856 (La.App. 3 Cir. 3/2/94), 634 So.2d 1254, 1258.
However, we noted in dicta in Orleans Parish School Board v. Gegg, supra, at p. 9, 708 So.2d at 429:
[LSA-C.C.] Articles 2315 and 2316 provide causes giving rise to tort actions, including negligent misrepresentation, between parties whose relationship is ungoverned by specific titles of the Civil Code. Appropriately, the section of the Louisiana Civil Code, which includes *644 article 2315 and 2316, is Book III, Title V, Chapter 3 entitled Obligations Arising Without Agreement. The heading illustrates the idea that the articles therein only govern the relationship between parties in the absence of more specific articles.
As an article 2315 tort, negligent misrepresentation entitles a successful plaintiff to an award of damages for mental anguish, pain and suffering.
Furthermore, there is no evidence that Article 22 of the construction contract between Gegg and the School Board, drafted by the School Board so that any ambiguities in the contract shall be construed against the Board, limits damages to economic damages.
The trial court's award of $100,000 in damages for emotional distress and mental anguish is clearly supported by the testimony of Mr. and Mrs. Gegg. It is clear that Mr. Gegg suffered acute depression, loss of his feelings of self-worth, humiliation at no longer being a family bread-winner, and the loss of his heretofore realized dream of having his own successful construction business. It is clear from his career path that his earlier employment as an appraiser and construction manager for several major construction companies demonstrates his focus on this field. Just as clearly, the loss of his bonding capacity, caused by the School Board's negligent misrepresentation of the suitability of his insurance coverage, led to these non-economic damages. See, Louisiana Farms a/k/a Bartmess Farms v. La. Dept. of Wildlife and Fisheries, 95-845 (La.App. 3 Cir. 10/9/96), 685 So.2d 1086.

CONCLUSION AND DECREE[20]
For the foregoing reasons, the trial court's judgments of November 29, 2001 and January 8, 2003 are vacated, null and void. The trial court's partial summary judgments establishing the School Board's liability to Michael Gegg d/b/a JCM Construction Company are affirmed on our de novo review.
The trial court's judgment of November 9, 2001 is amended to add to the economic damages award $17,500 for plaintiff's lost equity in the Destrehan rental property, and $17,603 for the payment made by plaintiff to Poche/Integon and not reimbursed by the School Board. In all other respects the judgment of November 9, 2001 is affirmed.

JUDGMENT OF NOVEMBER 29, 2001 VACATED; JUDGMENT OF JANUARY 8, 2003 VACATED; JUDGMENT OF NOVEMBER 9, 2001 AMENDED AND, AS AMENDED, AFFIRMED.
JONES, J., Concurs in the Result.
NOTES
[1] The foregoing portion of the procedural history is taken from our reported opinions in this litigation: JCM Construction Company, Inc. v. Orleans Parish School Board, 663 So.2d 429, 430-431 and Orleans Parish School Board v. Gegg, 97-0947 (La.App. 4 Cir. 1/14/98), pp. 1-5, 708 So.2d 425, 426-427.
[2] The record contains an order dated October 21, 1991, dismissing by reason of settlement Poche's suit in No. 91-12146 on the docket of the Civil District Court for the Parish of Orleans.
[3] The School Board's exception is not in the record.
[4] The judgment identified June 23, 1999 as the hearing date; however, this must be a typographical error, since the motions for summary judgment were not filed until March 2000.
[5] The record does not include a copy of a motion by any party seeking to have the earlier judgments designated as final as of the time of their rendition.
[6] The writ application, bearing No.2001-C-1930 on the docket of this Court, was ordered consolidated with this appeal by order dated December 6, 2001.
[7] This judgment does not appear as an original in the record. The record was supplemented with a copy of this judgment.
[8] The record shows the date to be July 14, 1991.
[9] Gegg introduced a certified copy of Mr. Graffagnino's death certificate.
[10] This was a reviewed statement supported by the auditor's supporting letter.
[11] This method was identified by expert witness Dan Cliffe as a generally accepted accounting practice.
[12] No. 94-10255 on the docket of the United States Bankruptcy Court for the Eastern District of Louisiana.
[13] Following the testimony of Idania Hunter, the parties stipulated to the tax return figures for 1986, 1987, 1988, 1989, 1990 and 1991.
[14] Including $15,224.99 received by Mr. Gegg from the State of Louisiana in connection with his job with the welfare office.
[15] Including $13,031.96 received by Mr. Gegg from the State of Louisiana in connection with his job with the welfare office.
[16] Including $21,751.51 received by Mr. Gegg from the State of Louisiana in connection with his job with the welfare office.
[17] See, LSA-Const. Art. 5, section 10(B).
[18] This is the issue raised by Gegg in his application for supervisory review in No.2003-C-0299 on the docket of this Court. The writ has been consolidated with this appeal and is disposed of in our disposition of this assignment of error.
[19] The School Board failed to set forth in its brief a specification or assignment of errors as required by Rule 2-12.4, Uniform Rules Courts of Appeal. As a courtesy to counsel, we have attempted to extract from the School Board's appellant brief the errors it contends the trial court committed.
[20] Our disposition of these appeals disposes of the issues raised in the consolidated applications for supervisory review baring Nos.2001-C-1930 and 2003-C-0299.